FILED

2006 May-09  PM 03:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| SYONIA HUMPHRIES, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No.  7:04-cv-01160-HGD |
| | ) | |
| GUARDSMARK, LLC, | ) | |
| | ) | |
| Defendant | ) | |

## MEMORANDUM OPINION

The above-entitled civil action is before the court on the motion for summary

judgment filed by defendant, Guardsmark, LLC (Guardsmark).  (Doc. #15).  Plaintiff

in this action, Syonia Humphries, is pursuing an action against defendant, her former

employer, alleging that she was the subject of sexual harassment and retaliation in

violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights

Act of 1991, 42 U.S.C. § 2000e.  (Doc. #8, First Amended Complaint, at Counts IV

and V, respectively).  She also asserts claims of invasion of privacy, assault and

battery, outrage, negligent retention, and negligent supervision and training under

Alabama law.  (*Id.* at Counts VI, VII, VIII, IX, and X, respectively).

Guardsmark has filed a motion for summary judgment (Doc. #15), along with

evidentiary submissions and a brief in support of this motion. (Docs. #16 and #17,

respectively).    Plaintiff has filed evidentiary submissions and a Corrected Memorandum in Opposition to the Defendant's Motion for Summary Judgment. (Docs. #20 and #21, respectively).  Defendant filed a reply to plaintiff's submissions. (Doc. #24).  Therefore, the matter is ready for disposition.

Defendant, Guardsmark, is a privately owned company engaged in the business of providing uniformed security personnel to businesses and companies throughout the United States, including the State of Alabama.  Plaintiff, Syonia Humphries, was initially employed by Guardsmark as a security officer from February 1996 to August 1996, at which time she voluntarily left due to personal transportation issues.  She subsequently reapplied for employment with Guardsmark and was hired in November 2001 and assigned to perform security services at Guardsmark's client, Hunt Refining Company ("Hunt" or "Hunt Refining") in Tuscaloosa, Alabama.  She was maintained in this position until she was terminated on or about September 16, 2002. Humphries' complaint relates only to her second period of employment with Guardsmark.

At the same time that she was rehired by Guardsmark, Humphries obtained full-time employment with ARD Logistics, a supplier for Mercedes.  She worked 40 hours per week at ARD on the night shift (6:00 p.m. to 2:45 a.m.).  In order to be able to work both jobs, Humphries requested and was assigned to work weekend shifts at

2

Guardsmark, which allowed her to work 24 hours in two days.  She got another 16 hours of work for Guardsmark by working day shifts during the week.

Ms. Humphries' supervisor was Chris Taylor.  When she was initially re-employed by Guardsmark, she worked "close" to four days with Taylor in the guardhouse at Hunt.  (Humphries Depo. at 147-50).  She worked the remainder of her work week on the weekend.  (*Id.* at 151).  Subsequently, she requested and was allowed by Taylor to change her work schedule in order to work the weekend shifts so that she got in 24 hours of work on the weekends and the remaining 16 hours by working two shifts during the week.  (*Id.*).  During the weekday shifts, Ms. Humphries worked only with Chris Taylor.  On the weekends, she worked with "everyone."  (*Id.* at 155).

At the time of her re-employment with Guardsmark, Guardsmark had a sexual harassment policy.  (*See* Defendant's Ex. 3, Sexual Harassment Policy Statement). In this policy, Guardsmark asserts that it is illegal and against its policy for any employee to sexually harass another employee or non-employee.  The policy defines sexual harassment as making unwelcome sexual advances or requests for sexual favors or other verbal or physical contact of a sexual nature a condition of an employee's continued employment; making submission to or rejection of such

conduct the basis for employment decisions affecting the employee; or creating an intimidating, hostile or offensive working environment by such conduct. (*Id.* at ¶ 1).

The policy statement further provides that any employee who believes he or she has been subjected to sexual harassment by a Guardsmark employee must call and give an oral report of the alleged act immediately (preferably within 48 hours after the alleged harassment occurs) to his/her Manager in Charge **AND** to the Sexual Harassment Policy Compliance Officer(s), Stephan I. Kasloff or Donna D. Smith at 1-800-238-5878, at Corporate Headquarters.  In the event these two individuals are not present to assist the employee, he/she is directed to ask to speak to O. Franklin Lowe or Dr. Sandra E. Peiser at the same number. (*Id.* at ¶ 2).  The policy states that an investigation of the complaint will be undertaken immediately and, if found to be true, the company will impose sanctions on the offending employee up to and including termination.  The policy also states that it is against company policy for anyone to retaliate against an employee for reporting any type of sexual harassment. (*Id.*).  Humphries was aware of Guardsmark's sexual harassment policy and understood that Guardsmark not only encouraged but required employees who believed they were being harassed to report the conduct as soon as possible. (Humphries Depo. at 30, 85).

Ms. Humphries is pursuing a sexually hostile environment claim against Guardsmark based on the conduct of Chris Taylor. She also makes a claim of retaliation, which she asserts occurred after she complained about Taylor's conduct when, among other things, Taylor cut her working hours to a total of 24 hours. (*Id.* at 154).

Humphries testified that on her first day of work, Taylor introduced a Hunt Refining truck driver to her, stating "this is Jerome with the big dick." (*Id.* at 171-72). According to Ms. Humphries, after Jerome went through the gate, Taylor "constantly continued to talk about Jerome's penis." (*Id.* at 172).

Humphries stated that she was "in shock" because of these statements and made no comment. She turned and walked to the other side of the guardhouse from where Taylor was sitting. Humphries did not report this comment at that time but did report the comment about seven months later. (*Id.* at 175-76). Humphries also testified that sometime prior to June 2002, Taylor also made the comment that Jerome's penis was so big that he sent his old girlfriend to the doctor. (*Id.* at 266-67). According to Ms. Humphries, Taylor either made a comment of this sort every day or "did his little hand language when Jerome came through the gate." (*Id.* at 176-77, 250). Plaintiff did not report Taylor's remarks about Jerome to company officials until June 2002. (*Id.* at 194). She never reported the hand motions. (*Id.* at 196).

Humphries testified that in January 2002, she spoke to Taylor about his inappropriate comments.  She told him that his remarks made her uncomfortable and were embarrassing.  Taylor sat in his chair, smirked, and said nothing.  (*Id.* at 93-94, 219-21).  Plaintiff alleges that she said something to Taylor a second time in March 2002.  However, the details of this conversation are difficult to glean from the record citations cited in plaintiff's brief.[1]  Despite these conversations, she alleges that his conduct continued.

Humphries asserts that a truck driver named Stallworth came through, and she was introduced to him by Taylor.  After Stallworth had come through a few times, Taylor told Stallworth that Ms. Humphries "wanted him" on several occasions, in her presence.  (*Id.* at 179-80, 183).  Taylor began to say this to Stallworth during Ms. Humphries' first week on the job.  (*Id.* at 182).  According to Ms. Humphries, on one occasion, Stallworth got out of his truck, came in the guardhouse, sat in Taylor's lap,

---

[1] The only references to a second conversation in the citations to plaintiff's deposition testimony are on pages 93, 254-55 and 262 of her deposition when she testified that her first conversation with Taylor was in January 2002 "[b]ecause the second time I did the allegation to Guardsmark."  Later in her testimony, plaintiff testified that she first contacted an official with the company in April 2002 when she contacted Keith Rosamond.  (Humphries Depo. at 253).  She testified that Terrance Martin told her that Taylor had said she was talking about the size of Martin's penis.  (*See* p. 8, *infra.*).  She asserted that she talked to Taylor about this.  (Humphries Depo. at 262).  Humphries further testified that she called Rosamond the day after her conversation with Martin, which was in March or April 2002.  (*See* pp. 7-8, *infra*).  She testified that she talked to Taylor about this before she called Rosamond; therefore, any second conversation with Taylor would also have been in March or April 2002.

6

rubbed the back of Taylor's head and told him he wanted Taylor to give "some female" a job. (*Id.* at 187). This female, Evelyn Jackson, eventually was hired. (*Id.* at 185). Plaintiff did not report this until June of 2002. (*Id.* at 197).

Plaintiff also testified that throughout November 2001 Taylor told Hunt truck drivers Jerome Dixon and Mehillis Wells, that she "wants you bad" and wanted them to come to the guardhouse and "do her on the table." (*Id.* at 189, 193, 197-98). Humphries states that she never complained to anyone about these comments until June 2002.

She testified that in December 2001 Taylor also told a co-worker, Jim Burns, that he should take Ms. Humphries into the bathroom and "give Syonia that big thing" and to "leave the door open because he wanted to watch." (*Id.* at 198-99, 209, 364-65).[2] She did not report this incident to a company official. (*Id.* at 201).

In February or March 2002, plaintiff asserts that Taylor observed a Hunt employee named Robin coming towards the gate and stated, in plaintiff's presence, that he "wanted to watch Terrance Martin make love to Robin and Robin and Syonia

---

[2] In plaintiff's brief, counsel cites as evidence of harassment an alleged direct quote from Humphries' deposition that Taylor had told a co-worker that "Syonia wanted him to come into the guardhouse and f__k her." (Doc. #21, Plaintiff's Corrected Memorandum in Opposition, at 7, ¶ 4). A review of the cited deposition testimony reflects that no such quotation exists. While the gist of the statement is correct, the word "f__k" is not used anywhere in plaintiff's deposition. The court believes that this mis-statement was simply an oversight, but attorneys for both parties are urged to make sure that quotations of deposition testimony are correct.

to have sex together." (*Id.* at 235-36, 240, 244-46, 248). According to Ms. Humphries, in May 2002, Taylor stated that "it would be worth $700 to watch Syonia and Martin have sex." (*Id.* at 267, 364).

On another occasion between March and April 2002, Ms. Humphries was told by co-employee Terrance Martin that Taylor had told him that she was talking about the size of his penis and he asked her if this was true. Humphries advised him that it was not. (*Id.* at 253-54). In May 2002, a driver for Barnett Trucking Company approached plaintiff in a China Buffet Restaurant and said that Taylor had told him that she wanted this driver sexually. (*Id.* at 263). She did not report this incident to a company official until June 2002. (*Id.* at 265).

Humphries testified that she also was asked by Taylor if she ever had sex in front of people and if she played the "watching game." (*Id.* at 265-66). She also testified that in April 2002 Terrance Martin told her that Taylor had tried to touch him. (*Id.* at 195). Humphries never reported this to company officials. (*Id.* at 196). In addition, Humphries testified that Taylor repeatedly asked Martin to go to a casino with him. (*Id.* at 254). She never reported this to Guardsmark. On another occasion, Humphries observed Taylor watch co-employee Demetrick Watkins walking away from him when he made the comment that he "liked watching him walk away." (*Id.* at 204).

Ms. Humphries testified that in April 2002, after her conversations with Martin and Watkins, she called a Guardsmark representative in Birmingham, Keith Rosamond.    Rosamond was not a Sexual Harassment Compliance Officer for Guardsmark or one of the individuals identified in the Guardsmark Sexual Harassment Policy as a person to call to complain about sexual harassment.  She had come to know Rosamond in 1996 when he interviewed her for the job she held the first time she worked for Guardsmark.  (*Id.* at 51-52, 253).  She testified that she told Rosamond that:

> Chris had gone crazy.  And not only that, during that time, that's when my hours – I had – my hours had – I'm quite sure I lost another hour, another eight hour during that month, because I told him, I said Chris is playing with people's wages, I mean, playing with people's money and hours, and I told him that he had just done crazy down here.

(*Id.* at 255-56).   When asked if she said anything at all about alleged sexual harassment or sexual comments by Taylor, Humphries responded: "I mentioned the word 'harassment,' I said Chris is down here harassing the guards."  (*Id.* at 256).  When she also was asked whether she told Rosamond that she, Humphries, was being sexually harassed, she responded:  "No, because when I asked him can he talk and he told me he didn't have time, and then when I told him that, he said, quote, that's no

9

surprise." (*Id.*).  She acknowledged that she did not tell Rosamond that she was being "sexually harassed," only that Taylor was "harassing."  (*Id.*).

She did not call Rosamond back the following day or any time immediately thereafter to tell him of Taylor's sexually harassing conduct because: "He said (Taylor's "harassing") was no surprise and he just didn't seem interested at that time, and I didn't bother to call back.  I didn't bother to call back." (*Id.* at 258). Humphries admitted that it "[p]robably would have" been a good idea to tell Rosamond about Taylor's sexually harassing conduct at that time, if not several months earlier, "if [she] would have had enough time." (*Id.*).

Ms. Humphries' attention was directed to the section of the harassment policy which provides a toll-free number for her to call and the names of persons to talk to in order to report sexual harassment.  When she was asked why she did not call one of these people, she responded that, while she could have done this, she did not because she wanted to talk to Rosamond whom she trusted.  (*Id.* at 259).  Ms. Humphries was asked, if she so trusted Rosamond, why did she not call him back or tell him to call her back because she needed to tell him some things.  She responded: "I can't answer that, because I don't know."  (*Id.*).

In June 2002, Ms. Humphries made a written complaint about Taylor's conduct which she mailed to Guardsmark, to the attention of Keith Rosamond, on June 13,

2002.  She followed this up with the transmission of a facsimile of this document on

June 17, 2002.  (*Id.* at 272).  The document faxed by Ms. Humphries reads as follows:

> I Syonia H. Humphries hereby in writing on this the 13[th] day of June 2002 bring forward the following complaint against an Guardsmark [*sic*] employee, Chris Taylor.  Questioning Sgt. Taylor position and duties as supervisor.  Several unexpected and unprofessional issues occurred during shift change hours with Sgt. Taylor and I. Discrimination In the workplace
>
>> a.    violating Regulations, Paragraph 13 of Guardsmark General orders, Regulations and Instructions.
>>
>> b.    intentional discrimination among Guardsmark employees.
>
> Sexual Harassment
>
>> Paragraph 12, Section C of Guardsmark Orders, Regulations and instructions. Allegations of Dishonesty im proper behavior and refusal to follow orders, improper behaviors and refusal to follow prescribed method of doing the job
>
>
> Syonia H. Humphries
> #382401

(Defendant's Ex. 6, Facsimile Letter of Ms. Humphries dated June 13, 2002).

Ms. Humphries provided no further specifics of her complaint regarding Taylor

until she met with Guardsmark officials Jim Cleaver and Kim Ford on or about

11

June 26, 2002.  (Humphries Depo. at 273).  During that conversation, Humphries

related some of the comments that had been made by Taylor, including Taylor telling

drivers that she wanted them and that he wanted to watch Terrance Martin making

love to Robin and Robin making love to Humphries.  She also complained that Taylor

was arbitrarily cutting her hours.  (*See* Plaintiff's Ex. 3, Notes of Interview with

Syonia Humphries by Jim Cleaver and Kim Ford).

Shortly after this meeting, Jim Cleaver asked Guardsmark employee Tommy

Pettis to conduct an investigation into plaintiff's allegations.  (Cleaver Depo. at 110-

11; Pettis Depo. at 28-30, 35-36).[3]  Pettis received from Cleaver a typed summation

of the statement that Ms. Humphries had provided to Cleaver (Pettis Depo. at 34), but

he never met with Ms. Humphries during the investigation to obtain any more

information from her.  (*Id.* at 36).

Pettis went to Tuscaloosa, first met with Chris Taylor (*id.* at 40), and then

interviewed the officers assigned to the Hunt Oil facility.  (*Id.* at 38).  At his meeting

with Taylor, which occurred at the Hunt Oil guardhouse, Pettis informed Taylor of

plaintiff's allegations and gave him a copy of a memo in which Pettis had outlined the

allegations of Ms. Humphries as related to Pettis by Cleaver.  (*Id.* at 41).  These

---

[3] Plaintiff also cites to a Smith deposition in her brief.  However, the court has been unable
to locate any such deposition in the evidentiary submissions of the parties.

12

included her claims that Taylor told drivers that she wanted them sexually and that he wanted to see Terrance Martin making love to Robin and Robin making love to Humphries at the same time. It also included her complaint that Taylor was constantly changing the work schedules to add or reduce hours for certain officers and contained a statement that Ms. Humphries had alleged that Taylor had made sexual advances to male officers, asked them to go to casinos with him, and cut their work hours if they refused. The memo further alleged that she stated that Taylor had discriminated against white applicants who wished to become security officers. (Defendant's Ex. 5, Undated Memo from Tommy Pettis to Christopher Taylor).

Taylor was given the option of responding to the charges verbally or in writing and he chose the latter. (Pettis Depo. at 42). Taylor furnished his response in one or two days. (*Id.*). Taylor denied the charges. (Pettis Depo. at 172-73). Near the end of his investigation, Pettis went over the allegations with Taylor but took no notes of his initial meeting with Taylor or the second meeting. (*Id.* at 41-42, 211). Although he took notes of all the other interviews he performed and kept them in his office in Mobile, Pettis stated that he cannot locate them. (*Id.* at 44-46).

During this first interview, Taylor denied the charges. Pettis told Taylor the charges were serious and he wanted him to look at each of the accusations and respond. (*Id.* at 48). Before he received a response from Taylor, Pettis began to

13

undertake interviews with the other Guardsmark employees and others who worked at the Hunt facility.  (*Id.* at 51).  Pettis put together a list of questions for these employees to answer.  He did so without help or input from Guardsmark officials. (*Id.* at 52).  The list of questions contained no specific references to Taylor or questions regarding whether Taylor had made any sexually inappropriate comments. (*Id.* at 54-55).  Pettis only asked "[H]ave you ever been approached in a sexual manner by another employee of Guardsmark?"  (*Id.* at 56).

Virtually none of the guards responded that they had been sexually harassed by anyone.  Their responses were, for the most part, one word responses from which Pettis did no follow-up.  (*Id.* at 212-13).  However, one employee, Terrance Martin, claimed that Taylor had made sexual advances toward him, both physically and verbally.  Pettis provided this information to Cleaver in a memorandum.  (*See* Plaintiff's Ex. 8, Memo from Pettis to Cleaver Re:  Statement of Terrance Martin).

Martin advised Pettis that for a while, every time he came to work, Taylor would talk about how big he was sexually and that he wanted to verify it.  He also told Martin that he was good looking and that he wanted to get a yard stick to measure "it."  He further stated that Taylor would call him at home as much as three times a day just to talk.  (*Id.*).

14

According to Martin, Taylor told him that, if Martin would do what Taylor wanted, Martin would be going to the bank with a check.  He also advised Pettis that Taylor repeatedly asked him to go to the casinos with him and stated that he did not need any money because it would be provided for him.  According to Martin, on one occasion, Taylor came up behind him and grabbed him by the hips.  Martin stated Taylor was constantly coming up behind him and pulling his shirt-tail out.  He speculated that Taylor and guard Greg Stallworth were involved in a relationship.  (*Id.*).  Martin also reported that Taylor made the statement to him and Humphries that he would like to see Hunt employee "Robin" and Humphries having oral sex and Martin having sex from the rear with "Robin" at the same time.  (*Id.*).

Martin also complained that Taylor manipulated his work hours and made the comment that Birmingham was trying to send a white officer, but he was not going to let it happen.  (*Id.*).  Martin advised Pettis that he did not come forward earlier with his allegations because he was afraid of losing his job.  (*Id.* at 60).  Pettis did not question Taylor about the allegations made by Martin.  (*Id.* at 59).

Demetrick Watkins testified that contrary to the undated statement typed by Pettis, he informed Pettis that Taylor groped him and exhibited inappropriate conduct towards him.  (Watkins Depo. at 91, 98, 183-84, 215-16, 220-21).

15

Taylor provided Pettis with a hand-written response to the list of typed questions which Pettis had given him a couple of days prior. (Pettis Depo. at 62-63). Pettis received Taylor's responses from him at the guardhouse where Taylor was working and went over his answers with him at that time. However, he spent only about 30 minutes with Taylor. He testified that he did not do an "in depth" interview with him at that time because the guardhouse area was too busy with on-going work. He never met with Taylor at a later time for a more in-depth interview concerning the allegations. (*Id.* at 63-66).

In his handwritten responses, Taylor stated that he did occasionally reduce the hours of some of the guards but that this was only done when it was needed. (Plaintiff's Ex. 6, Memo from Pettis to Taylor containing handwritten responses). He admitted that he occasionally went to casinos but stated that Humphries goes also and no one else ever went with him. (*Id*). With regard to whether Taylor told drivers that Humphries wanted them sexually, Taylor responded that it was "only her word" that this had occurred. (*Id.*).

With regard to a question concerning whether he "went crazy" once when "Robin" came through the gate and told Humphries that he wanted to see Humphries making love to Robin and Robin making love to Martin, Taylor responded only that "Robin and I have talk concerning my joking with her. She understand and respect

16

me like I do her." (*Id.*).  Pettis testified that he did not know what kind of joking Taylor was talking about and did not question him about this.  (*Id.* at 70).  Pettis never talked to Robin.  (*Id.* at 212).  Although he testified that he believed "to some degree" that the incident regarding the comments Taylor was alleged to have made about Robin occurred, Pettis made no record of the fact that he believed Taylor had violated the company's sexual harassment policy.  (*Id.* at 229-30).

Taylor stated to Pettis that, when a "white guy" came to the guardhouse looking for employment information, he turned him away only because there were no jobs available at that time.  He told this man to go to Guardsmark's Birmingham office.

Pettis testified that he asked Taylor if he had made any sexual advances toward any of the male employees.  According to Pettis, Taylor admitted that he went to casinos but denied that he had made sexual advances toward male employees and asked them to go to the casinos with him.  (*Id.* at 68, 172).  He also denied making any sexual comments to Ms. Humphries or other guards.  (*Id.* at 172-73).

Pettis testified that the last person he spoke with during his investigation was plaintiff.  Pettis did not interview Humphries for her version of events or to get her response to Taylor's statement.  Pettis testified that at this meeting all he did was tell

17

Humphries that he could not find enough information to substantiate her claim, but that Taylor would be counseled and that if she had any further problems, she was to contact Pettis as soon as possible. (*Id.* at 71). There is no written documentation to reflect whether Taylor actually received counseling. (*Id.* at 108). Nevertheless, after this time, Pettis received no further complaints from anyone, including Ms. Humphries, regarding Taylor engaging in inappropriate behavior. (*Id.* at 185).

Humphries testified that after her complaint, Taylor made a sex-related comment to her on one more occasion. Although she was unsure of the exact date this last comment was made, she asserted that it "had to be" sometime during the first part of July 2002, but sometime after the Fourth of July. She did not report this incident to anyone at Guardsmark. (Humphries Depo. at 305-07, 309-12).

However, according to Ms. Humphries, Taylor began to harass her in other ways. She alleged that Taylor hid company memos from her on numerous occasions. However, other than her own belief that Taylor was removing memos, she had no evidence that he was the one who was actually doing this. (*Id.* at 313-18). On one other occasion, Humphries stated that Taylor put a sign on the computer that it was out of order when it was not. The sign on the computer was signed by Taylor. Several other employees told her that Taylor had done this. (*Id.*). Humphries believed that Taylor was doing this to get back at her for complaining about him. (*Id.*

18

at 317-18).  Despite Taylor's actions, Humphries testified that she was able to perform her job effectively.  (*Id.* at 307-08, 309).

After the interviews referenced above, Pettis sent a memo to James Cleaver stating that he had completed his investigation.  He advised Cleaver that the only guard to support Humphries' allegations was Terrance Martin.  He reported that, other than Martin, he was unable to substantiate the allegations made by Ms. Humphries.  He stated that Taylor was instructed that in the future there was to be no casual conversation in the guardhouse regarding sex or race.  (Defendant's Ex. 12, Undated Memo From Tommy Pettis to James Cleaver).

Pettis acknowledged that the comments as alleged by Ms. Humphries and Mr. Martin violated the Guardsmark policy.  (Pettis Depo. at 85).  However, Pettis testified that he did not believe Humphries (*id.* at 78) and did not "one hundred percent substantiate" any of their claims.  When asked what he would need for any of these claims to be one hundred percent substantiated, Pettis stated, "Probably more than one witness." (*Id.* at 86).  However, he acknowledged that in many cases sexual harassment occurs when only one person is present.  (*Id.*).

Pettis also acknowledged that he never interviewed any of the Hunt employees or the truck drivers who could have substantiated Humphries' claims.  (*Id.* at 88-89).  Likewise, he admitted that when he sent his report of investigation to the Birmingham

office, he made no mention of Martin's claims against Taylor. (*Id.* at 107). He also acknowledged that he became aware of the fact that Taylor was interviewed by Guardsmark employees Hughes and Ford on July 30, 2005, after the completion of his investigation. However, he never saw any documentation of this interview and never learned what questions were asked of Taylor or what his answers were. He was not aware that in his interview with Hughes and Ford, Taylor admitted making sexual comments about Robin and to other Guardsmark security officers, Hunt employees, or truck drivers. (*Id.* at 111-15). He testified that had he known this information, it would have helped him substantiate the allegations against Taylor. (*Id.* at 115).

Pettis also was questioned regarding the reason for Ms. Humphries' subsequent termination by Guardsmark. According to Pettis, Ms. Humphries and another guard, Demetrick Watkins, were terminated for allowing unauthorized personnel to enter the Hunt facility. (*Id.* at 117, 120). He testified that shortly before her termination, Hunt established a new policy regarding entrance to the facility. Hunt established a proximity guard system for employees allowing them to scan a card and gain entry. Everyone else was required to be cleared through the guardhouse where the security officer was required to obtain identification from the individual, call the shift superintendent and get permission for any non-employee to enter the facility. (*Id.* ).

20

The termination of Humphries and Watkins occurred because on a Sunday afternoon, the Hunt Oil attorney approached the gate, swiped his proximity card, pulled up and advised the security guard that his daughter was in the car behind him and that they were dropping off a car.  They both then proceeded to enter the facility, dropped off the car, and left.  (*Id.* at 120-21).  Based on these facts, Pettis terminated Humphries and Watkins with the approval of James Cleaver.  (*Id.* at 119).  Pettis does not know whether it was Watkins or Humphries who was working the entrance gate at the time this incident occurred.  (*Id.* at 122).  Although Pettis initially testified that both Humphries and Watkins admitted that the attorney's daughter was allowed in without obtaining her identification or logging her in or out, he later stated that he did not recall them admitting that they did not log them in or out.  (*Id.* at 121-31).  Likewise, Pettis states that Humphries and Watkins both admitted that they "were aware of the incident" at the time he called them to tell them they were terminated; however, he does not testify when they became aware of this information.  (*Id.* at 129-31).  Pettis has no documentation of his conversation with Ms. Humphries regarding this incident.  (*Id.* at 128).

According to Pettis, this incident came to his attention when the director of security for Hunt Oil, Wilbur Rainey, informed him that the Hunt counsel came to a staff meeting and said his daughter had been allowed in the facility the day before

without proper authorization and he (the director of security) wanted the officers terminated or replaced. (*Id.* at 132). However, when shown three memos regarding his contact with the director of security, Pettis acknowledged that none state that the security director wanted the two employees terminated. (*Id.* at 133). Pettis also does not recall whether he told Cleaver that Rainey wanted them terminated and acknowledged that a memo from himself to Cleaver makes no mention that Hunt Oil wanted Watkins or Humphries terminated. (*Id.* at 134, 136). Likewise, he further admitted that a memo of a conversation regarding the incident that occurred between Rainey and Chris Taylor does not mention that Rainey wanted Watkins and Humphries terminated. (*Id.* at 134-136). Neither Humphries nor Watkins had received any previous reprimands regarding their work performance. Pettis states he could have issued any level of discipline, but he chose termination. (*Id.* at 146-47).

Pettis acknowledged that Mr. Rainey also reported that unauthorized individuals had been allowed into the facility the weekend before this incident, but he did no investigation of this claim. (*Id.* at 141-42). It was the decision of both Pettis and Cleaver not to investigate the incident that occurred the previous week. (*Id.* at 144). He also acknowledged that there have been other employees since January 2002 who violated Guardsmark's security policy. No one else was fired for this offense. (*Id.* at 234).

22

## SUMMARY JUDGMENT STANDARD

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23, 106 S.Ct. at 2552; *see* Fed.R.Civ.P. 56(a) and (b). Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or

by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.  The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings.  *Id.*

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. at 2511. A judge's guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether

it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52, 106 S.Ct. at 2512; *see Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11, 103 S.Ct. 2161, 2171 n.11, 76 L.Ed.2d 277 (1983); *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 643 (11th Cir. 1997). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matusushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson,* 477 U.S. at 254, 106 S.Ct. at 2513; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513. The non-movant need not be given the benefit of every inference but only the benefit of every reasonable inference. *Brown*

*v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Allen*, 121 F.3d at 643.


## DISCUSSION

### Hostile Environment Claim

The Eleventh Circuit set forth in *Mendoza v. Borden, Inc.*, 195 F.3d 1238 (11th Cir. 1999) (*en banc*), the elements that an employee must establish to support a hostile environment claim under Title VII based on harassment. An employee must establish: (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable. *Id.* at 1245.

The first, second, and third elements are clearly present here. Regarding the third element, defendant argues that Taylor harassed both male and female guards so that it cannot be said that his harassment was based on gender. However, regardless

26

of how he treated male guards, the testimony presented reflects that Taylor's motivation for his actions toward Humphries was clearly based on her gender.   The basis for plaintiff's cause of action is that she was subjected to a hostile environment based on her gender, and the actions alleged to have been taken toward her by Taylor were clearly based on her gender as a female.  Therefore, defendant's argument in this regard is without merit.

Also, with regard to the third element, mere "sex talk," without more, does not rise to the level of objectively severe and pervasive harassment.  *See, e.g., Adusumilli v. City of Chicago*, 164 F.3d 353, 357 (7th Cir. 1998) (holding the plaintiff failed to make out a *prima facie* case of sexual harassment where her coworkers teased her and made sexual jokes aimed at her); *Black v. Zaring Homes, Inc*., 104 F.3d 822, 823-24 (6th Cir. 1997) (holding male employee's comments and jokes in female plaintiff's presence were not sufficiently severe or pervasive to constitute an objectively hostile work environment).  However, plaintiff was subjected to more than mere sex talk. For instance, she was offered money to perform sex acts and was approached by truck drivers who had been told by Taylor that Humphries wanted to have sex with them.

The fourth element--that the conduct complained of was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment"--is the element that tests the mettle of most sexual harassment claims.

27

Requiring the plaintiff to prove that the harassment is severe or pervasive ensures that Title VII does not become a mere "general civility code." *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 2283-84, 141 L.Ed.2d 662 (1998)). This requirement is regarded "as crucial, and as sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace--such as male-on-male horseplay or intersexual flirtation--for discriminatory 'conditions of employment.'" *Gupta*, 212 F.3d at 583 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998)).

Accordingly, a plaintiff must establish not only that he or she subjectively perceived the environment as hostile and abusive, but also that a reasonable person would perceive the environment to be hostile and abusive. *See Mendoza*, 195 F.3d at 1246; *Faragher*, 524 U.S. at 788, 118 S.Ct. at 2284 (explaining that the objective component of the "severe and pervasive" element prevents "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" from falling under Title VII's broad protections (citation omitted)).

If the complained-of statements and conduct are of a gender-related or sexual nature, there are four factors that are considered in determining whether they are

28

sufficiently severe and pervasive from an objective standpoint to alter an employee's terms or conditions of employment:  "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance."  *Mendoza*, 195 F.3d at 1246.

In this case, viewing the evidence in the light most favorable to plaintiff, the sexual comments conduct by Taylor were frequent.  According to plaintiff, they occurred virtually every day she worked with him.  While the conduct did not involve any physical conduct, it did involve frequent references to the size of various employees' penises, comments regarding paying to see plaintiff and others engage in various acts of sexual relations, and telling truck drivers that plaintiff "wanted" them sexually to the point that she was approached by drivers on more than one occasion seeking to find out if this were true.  Consequently, even without physical contact, the conduct of Taylor was humiliating and degrading toward plaintiff.

Plaintiff testified that she did not let the actions of Taylor interfere with her job performance.  However, this fact alone is not sufficient to cause the court to conclude that the environment she was subjected to was not severe and pervasive and did not alter the terms and conditions of her employment.  It may simply mean that she tolerated ongoing offensive conduct in order to maintain her employment.  Whether

29

this environment was sufficiently severe so as to alter the terms and conditions of Ms. Humphries' employment is a question of fact which should be determined by a jury if this case was not disposed of on other grounds.

The fifth element necessary to establish a hostile environment claim requires that plaintiff establish a basis for holding the employer liable. Any liability for the actions of Taylor by Guardsmark is governed by several recent Supreme Court rulings. If the harasser is a supervisor, like Taylor, but the harassment has not resulted in "tangible job action," then the employer may nevertheless be held liable if the harassment is sufficiently severe and pervasive to alter the terms and conditions of employment, subject to an affirmative defense set out below. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 751, 118 S.Ct. 2257, 2264, 141 L.Ed.2d 633 (1998). On the other hand, if the supervisor's harassment has resulted in a tangible job action, the employer is vicariously liable for the supervisor's actions and no affirmative defense is available. *Faragher, supra.*

The evidence reflects that the actions by Taylor did not result in any "tangible job action" which affected Humphries. However, there is a factual issue with regard to whether the environment was permeated with severe and pervasive harassment. Assuming, for purposes of summary judgment, that plaintiff's job environment was

infected with severe and pervasive sexual harassment, the *Faragher/Ellerth* affirmative defense becomes an issue.

The *Faragher/Ellerth* defense contains two necessary elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807, 118 S.Ct. at 2293. The employer bears the burden of demonstrating both elements by a preponderance of the evidence. *Id*. An employer generally can satisfy its reasonable care requirement by, first, promulgating a comprehensive anti-harassment policy and, second, promptly responding to the employee's complaint. *Madray v. Publix Supermarkets, Inc*., 208 F.3d 1290, 1297-1300 (11th Cir. 2000).

Guardsmark had in place a policy against sexual harassment and a means by which an employee could complain and seek relief, even if the alleged harasser was her supervisor. The investigation into Humphries' complaint was incredibly slipshod. It was so perfunctory that the fact that the harassment ceased, with one isolated exception, appears to be more by accident than by design.[4] Nevertheless, despite the

---

[4] Tommy Pettis conducted his investigation of plaintiff's harassment complaint without ever reviewing Ms. Humphries' written complaint or interviewing her until his "investigation" was completed. Likewise, he never reviewed the notes taken by Jim Cleaver and Kim Ford when they

inadequacy of the investigation performed by Tommy Pettis, the fact remains that Guardsmark nevertheless took immediate action with regard to plaintiff's claims, ultimately counseled Taylor and directed that there be no sex-related comments or conversations in the guardhouse.  This action was sufficient under the circumstances, given the fact that the sex-related remarks by Taylor ceased, with one isolated exception which plaintiff did not report; and plaintiff has testified that neither Taylor's pre- nor post-complaint actions affected her ability to do her job.  This negates any liability on the part of defendant for Taylor's actions.  *See Walton v. Johnson & Johnson Servs., Inc.*, 347 F.3d 1272, 1288 (11th Cir. 2003) (where substantive measures taken by employer are sufficient to address the problem, complaints about the process of the investigation leading up to these measures ring

---

interviewed plaintiff.  Pettis' interview of Taylor consisted of providing Taylor a list of questions and allowing him to provide written answers.  Taylor was never subjected to any real questioning regarding the allegations.  Likewise, Pettis interviewed other guards by asking them general questions without any follow-up.  Incredibly, Pettis never asked any of the other guards any questions specifically related to Taylor's conduct.  He also never sought to interview any of the truck drivers that Humphries claimed Taylor had told that Humphries "wanted" them sexually.  Although Taylor admitted to making comments about Robin, he minimized it as a joke.  Taylor never interviewed Robin to ascertain the truth of this claim.  In addition, Terrance Martin told Pettis that he had been subjected to sexual harassment by Taylor.  Pettis never interviewed Taylor about Martin's claim.  Yet Pettis dismissed Martin's complaint, as well as Humphries' claims, as "unsubstantiated" and because other guards, who did not want to be identified, had told him that they felt that Martin and Humphries "created" their allegations to make trouble for Taylor.  Interestingly, the basis for this claim by these anonymous informants is also unsubstantiated.  Likewise, Humphries' claims were "unsubstantiated" because Pettis never bothered to interview the very people, such as truck drivers, who could have shown her claims to have been true or false.  The investigation by Pettis was either incompetent or undertaken with either the preconceived idea that no harassment had occurred or an intent to whitewash the harassment claims of Ms. Humphries.

32

hollow); *see also, Coates v. Sundor Brands, Inc*., 164 F.3d 1361, 1363-64 (11th Cir. 1999).

In addition to the one isolated post-complaint comment by Taylor, plaintiff asserts that he took other actions which were a continuation of the harassment. However, these actions, such as allegedly removing items from the company bulletin board and putting out-of-order signs on the guardhouse computer, taken by Taylor after Humphries made her complaint, were not sex-related and fall more appropriately under the heading of retaliation. The same is true with regard to her termination, discussed *infra.*

Furthermore, the evidence reflects that plaintiff was subject to harassment beginning in November 2001 but failed to report it in a manner consistent with Guardsmark's policy until June 2002. Nevertheless, the harassment report of Humphries eventually reached the correct department. Thereafter, Guardsmark undertook to perform an investigation and put in place remedial measures that caused the harassment to cease. Because plaintiff has failed to rebut the *Faragher/Ellerth* affirmative defense put forth by defendant, she has failed to establish a *prima facie* case of discrimination.

**Timeliness**

Defendant asserts that it also is entitled to summary judgment as to plaintiff's sexual harassment claim because she failed to timely file her claim with the Equal Employment Opportunity Commission (EEOC).  According to 42 U.S.C. § 2000e-5(e)(1), a charge must be filed with the EEOC within 180 days after the alleged unlawful employment practice occurred.  Regarding claims arising from allegations of a "hostile work environment," the timely filing provision of Title VII requires that a plaintiff file her charge within 180 days after "an act contributing to the claim occurs." *Nat'l R.R. Passengers Corp. v. Morgan*, 536 U.S. 101, 117, 122 S.Ct. 2061, 2074, 153 L.Ed.2d 106 (2002).

Ms. Humphries filed her charge with the EEOC on January 15, 2003. (Defendant's Ex. 1, EEOC Charge of Syonia Humphries).  Thus, in order for her claim to have been timely filed, the last act which she says constitutes a part of the harassment must have occurred on or after July 19, 2002.  However, Ms. Humphries' own testimony is the last time Taylor made a sex-related comment to her was sometime during the first part of July 2002.  (Humphries Depo. at 309-12).

Counsel for plaintiff asserts that there is evidence that Taylor continued to interfere with Humphries' duties even after this by removing employee memoranda from the Guardsmark bulletin board and by trying to keep her from using the

34

guardhouse computer to keep in contact with the home office by putting a sign on it that said that it was out of order.  However, the actions regarding the missing memoranda and the "out-of-order" computer were not acts of sexual harassment. There is nothing in these actions that reflects Taylor took them[5] based on a motive to harass Humphries because of her gender.  They occurred after plaintiff had made her complaint and after Pettis claimed he counseled Taylor about making any more sex-related comments in the guardhouse.  These actions may be construed as acts of retaliation, but they are not acts which create or contribute to a sexually hostile atmosphere.

Plaintiff argues that the "hostile atmosphere" endured by plaintiff was not immediately extinguished and continued to exist for some time after the last overt act of harassment.  Citing *Quillen v. American Tobacco Corp.*, 874 F.Supp. 1285, 1292-93 (M.D.Ala. 1995), and *Saville v. Houston County Healthcare Auth.*, 852 F.Supp. 1512, 1526-27 (M.D.Ala. 1994), plaintiff asserts that the 180-day time period for filing a claim with the EEOC did not begin to run until the hostile atmosphere dissipated.  Thus, she asserts that when the hostile environment ceased to exist and, thus, when the 180-day period began to run, is a jury question.

---

[5] For purposes of summary judgment only, it is assumed that Taylor committed these acts.

Each of the cases cited by plaintiff was decided prior to the Supreme Court's decision in *Morgan, supra*, and plaintiff's reasoning is in direct conflict with that decision.  In *Morgan*, the Supreme Court held that a hostile work environment is composed of a series of separate acts which constitute one "unlawful employment practice."  *Morgan*, 536 U.S. at 117, 122 S.Ct. at 2074.  The Court computed the statutory period for filing an EEOC charge of discrimination in a hostile environment case from the date of the last act contributing to the claim, not from some amorphous date the environment ceased to be hostile.  *Id.* at 105, 122 S.Ct. at 2068.  None of the acts which Ms. Humphries alleged contributed to the sexually hostile environment occurred within the 180 days immediately preceding the filing of her charge of discrimination with the EEOC.  As a result, her complaint of sexual harassment was not timely filed.

**Retaliation**

Although Humphries' claim of sexual harassment was not timely filed, the same is not true with regard to her claim of retaliation.  Her termination occurred well within the 180 days preceding her EEOC complaint.

A plaintiff alleging retaliation under Title VII must establish a *prima facie* case by showing that (1) she engaged in statutorily protected activity; (2) an adverse employment action occurred; and (3) the adverse action was causally related to the

protected activity. *Coutu v. Martin County Bd. of County Comm'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995). As to the first element, it is undisputed that the plaintiff participated in protected activity by complaining about Taylor's harassment.

An adverse employment action is an ultimate decision such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives her of employment opportunities, or adversely affects her status as an employee. *Gupta*, 212 F.3d at 587. Although the alleged actions of Taylor after plaintiff's complaint were retaliatory in nature, they did not result in an adverse employment action. In fact, these actions did not affect her employment at all. Furthermore, she never reported the events to the management at Guardsmark. However, Humphries' termination by Guardsmark is clearly an adverse employment action which occurred after she engaged in a statutorily-protected activity. Thus, Humphries has established the first two elements of her *prima facie* case.

With regard to the third element, a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated. *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir.), *cert. denied*, 474 U.S. 981, 106 S.Ct. 385, 88 L.Ed.2d 338 (1985). Humphries' handwritten complaint was filed with Guardsmark on June 13, 2002, and faxed to

Guardsmark on June 17.  On June 26, 2002, plaintiff met with Cleaver and Ford and, for the first time, gave detailed information regarding the alleged harassment.  The investigation into her complaint extended into early July 2002.  Plaintiff's termination was based on an incident which occurred in early September 2002 and came to the attention of Guardsmark on or about September 16, 2002.  She was advised by Tommy Pettis shortly thereafter that she was terminated from her employment with Guardsmark for her alleged involvement in this incident.  Thus, there is a two-and-a-half-month lapse between Humphries' complaint and the investigation related to it and her termination.

"Close temporal proximity between the protected activity and the adverse action may be sufficient to show that the two were not wholly unrelated."  *Bass v. Bd. of County Comm'rs*, 256 F.3d 1095, 1119 (11th Cir. 2001) (citation omitted).  The Supreme Court has stated that "mere temporal proximity between . . . knowledge of protected activity and an adverse . . . action . . . must be 'very close.'"  *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 1511, 149 L.Ed.2d 509 (2001) (citations omitted).  The Court cited with approval decisions in which a three- to four-month disparity was found to be insufficient to show causal connection.  *See id.* (*citing Richmond v. ONEOK*, 120 F.3d 205, 209 (10th Cir. 1997) (three-month period insufficient) and *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992)

(four-month period insufficient)).  If there is a substantial delay between the protected

expression and the adverse action in the absence of other evidence tending to show

causation, the complaint of retaliation fails as a matter of law.  *Higdon v. Jackson*,

393 F.3d 1211, 1220 (11th Cir. 2004).

However, here the time period is 10½ weeks.  It is on the borderline of cases

which hold that temporal proximity is sufficient to establish a causal connection and

those which hold it is not*.  Compare Richmond v. ONEOK, supra*, and *Hughes v.

Derwinski, supra*, with *Donnellon v. Fruehauf Corp*., 794 F.2d 598, 601 (11th Cir.

1986) (one-month gap between filing of EEOC complaint and termination was

sufficient to carry plaintiff's initial burden of showing causal connection); *Quinn v.

Green Tree Credit Corp*., 159 F.3d 759, 769 (2d Cir.1998) (employee satisfied causal

connection requirement by showing she was discharged two months after filing

sexual harassment complaint with employer, and 10 days after lodging same

complaint with state agency);  *Hendricks v. Baptist Health Servs.*, 278 F.Supp.2d

1276, 1288 (M.D.Ala. 2000) (two-month span between plaintiff's protected conduct

and her suspension, and three-month span between her protected conduct and

termination, constitute a "close temporal proximity" sufficient to establish a causal

connection between the protected activity and adverse actions); *Mills v. Amoco

Performance Prods., Inc.*, 872 F.Supp. 975, 990 (S.D.Ga. 1994) (two-month gap

between filing of EEOC complaint and disciplinary action is sufficient to raise triable issue of fact as to causal connection); *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1332, 1337 (11th Cir. 1999) (holding that, where the plaintiff filed an EEOC charge on May 19, 1995, and was terminated seven weeks later, "this time-frame" was "sufficiently proximate to create a causal nexus for purposes of establishing a *prima facie* case").

However, there is evidence that the same act for which Ms. Humphries was terminated also occurred the preceding weekend and that there was no investigation and no disciplinary action taken with regard to that occurrence. These two factors are sufficient to reflect a causal connection between her termination and her protected activity. Thus, petitioner has established a *prima facie* case of retaliation.

Once the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for firing the plaintiff. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). Should the defendant satisfy its burden of production, the presumption raised by the plaintiff's *prima facie* case is rebutted; and the plaintiff now must demonstrate, by a preponderance of the evidence, that the legitimate reasons offered by the defendant were not its true reasons. *Id.*; *see also, Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1562 (11th Cir. 1987).

Defendant asserts that plaintiff was terminated along with Demetrick Watkins for allowing an unauthorized person to enter the Hunt Oil facility. Guardsmark proffers this as its legitimate, non-discriminatory reason for Humphries' dismissal. However, there is ample evidence to create an issue of fact as to whether this stated reason is pretextual.

The decision to terminate Humphries and her co-worker for this alleged violation was made by Pettis before he ever spoke to either one about the incident that led to their dismissals. (Pettis Depo. at 130, 131). Pettis is the same individual who performed the extraordinarily poor investigation into Humphries' original claims of sexual harassment. (*See* footnote 4, *supra*). Although he initially claimed that he terminated Humphries and Watkins because Hunt wanted them terminated, he later admitted that there is no documentation or other evidence which supports this claim.

Pettis testified that he did not know whether it was Humphries or Watkins who actually let the unauthorized person in or out of the facility, and he made no effort to find out. According to Ms. Humphries, Watkins was the person who let the lawyer and his daughter in and should have logged them in, if necessary, pursuant to Hunt's security policy. She further testified that it was Watkins' duty to log out anyone he logged in. On this date, Humphries states that she was stamping invoices for trucks going in and out of the facility. The logging in and out of visitors was Watkins' job,

41

and she was not paying attention to whether he was doing it correctly.  (Humphries Depo. at 345-352).

Although he considered Humphries' violation sufficiently egregious to warrant her termination, Pettis admitted that there had been a similar occurrence the previous weekend.  However, he had conducted no investigation to determine who had allowed unauthorized persons in on the earlier occasion and took no action to punish the guilty party.  Further, defendant admits it took no disciplinary action against employees allowing unauthorized persons to enter the Hunt Oil premises after the termination of plaintiff and Watkins.  This evidence is sufficient to create a genuine issue of material fact as to pretext.  *See Sparks*, 830 F.2d at 1564 (the implausibility of asserted justifications creates a genuine issue of material fact sufficient to preclude judgment as a matter of law).

**State Law Claims**

Plaintiff makes claims for invasion of privacy, outrage and negligent supervision, retention and training, which are based on Taylor's conduct and for which she seeks to hold Guardsmark vicariously liable.[6]

---

[6] Plaintiff's Amended Complaint included a claim for assault and battery.  However, she is no longer pursuing this cause of action.  "Humphries is pursuing state law claims of invasion of privacy, outrage, and negligent supervision, retention and training.  Humphries is no longer pursuing a claim of assault and battery."  (Doc. #21, Plaintiff's Corrected Memorandum in Opposition to Defendant's Motion for Summary Judgment, at 31-32).

In order to prevail on these claims against Guardsmark, under Alabama law, plaintiff must demonstrate that (1) Taylor's wrongful acts were within the scope of his employment or in furtherance of the business of Guardsmark or (2) Guardsmark participated in, authorized, or ratified the wrongful acts. *See Potts v. BE&K Constr. Co.*, 604 So.2d 398, 400 (Ala. 1992). The conduct of Taylor was not within the scope of his employment as a security guard for Guardsmark. *See Busby v. Truswal Sys. Corp.*, 551 So.2d 322, 327 (Ala. 1989) (acts of sexual assault or harassment by an employee are, as a matter of law, outside the line and scope of an employee's employment). Therefore, plaintiff must produce evidence which reflects that Guardsmark ratified, authorized, or participated in the wrongful conduct.

In order to prove ratification, participation or authorization, plaintiff must show (1) that Guardsmark had actual knowledge of the tortious conduct and that the conduct was directed at and visited upon the plaintiff; (2) that based upon this knowledge, the employer knew, or should have known that such conduct constituted sexual harassment; and (3) that the employer failed to take adequate steps to remedy the situation. *Potts*, 604 So.2d at 400.

Based upon the analysis above, the evidence reflects that the defendant took adequate steps to remedy the situation when it counseled Taylor and told him that there was to be no further sex-related comments or conversation in the guardhouse.

43

Except for one isolated incident, the sex-related comments and conversations ceased. This is sufficient. *See Potts*, 604 So.2d at 401 ("[I]f the undisputed evidence shows that the employer, as soon as it was practical to do so after learning of the conduct, took steps to stop the conduct and the tortious conduct stopped, the steps taken by the employer were adequate, as a matter of law."). Therefore, Guardsmark is not vicariously liable for the actions of Taylor under a ratification theory.

## Outrage Claim

To establish the tort of outrage, the plaintiff must show: (1) that the defendant intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct, (2) that the conduct was "extreme and outrageous," and (3) that the actions of the defendant caused the plaintiff emotional distress so "severe" that no reasonable person could be expected to endure it. *Am. Road Serv. Co. v. Inmon*, 394 So.2d 361, 365 (Ala. 1981). *See also U.S.A. Oil, Inc. v. Smith*, 415 So.2d 1098, 1100 (Ala.Civ.App. 1982). The Alabama Supreme Court has defined extreme conduct as "conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Potts v. Hayes*, 771 So.2d 462, 465 (Ala. 2000). The tort will not reach conduct that amounts to "mere insults, indignities, threats [or] annoyances." *McIsaac v. WZEW-FM Corp.*,

44

495 So.2d 649, 651 (Ala. 1986).  The Alabama Supreme Court has limited the

instances in which a claim for the tort of outrage should lie.  *See Potts v. Hayes*, 771

So.2d at 465 ("The tort of outrage is an extremely limited cause of action.").  Indeed,

the Alabama Supreme Court has recognized the tort in only three types of cases:

(1) those arising out of wrongful conduct in the family-burial context, (2) those

arising out of "barbaric methods employed to coerce an insurance settlement," and

(3) those arising out of "egregious sexual harassment."  *Id.*

In *Busby*, *supra*, the Alabama Supreme Court found evidence that plaintiff's

supervisor engaged in extreme sexual harassment of the plaintiff and three other co-

employees when he:

> (1) invited Busby and Money to swim in his pool in the
> nude with him; (2) told Busby that his hands were cold and
> asked if he could put them in her pockets to keep them
> warm; (3) told the plaintiffs that he would "put a stick on
> their machines" so they could masturbate while working;
> (4) said that he could perform intercourse as fast as one of
> the machines at the plant could operate; (5) said that he
> wished that the plaintiffs would come to work braless and
> wear less clothing; (6) told one of the plaintiffs that if she
> had not stayed up all night having sex she could do her
> work properly; (7) told one employee that if she would
> give him 30 minutes with her that he would fill her pants in
> nine months for her; (8) acted as if he was going to pinch
> one plaintiff's breasts with a pair of pliers and with his
> hands; (9) said that he should send one of the plaintiffs
> across the street to where a group of men were standing
> because she stayed sexually aroused all of the time;

(10) told one of the plaintiffs that he was very tired and asked her if she would accompany him to the restroom and hold his penis while he urinated; (11) told one of the plaintiffs that her nipples were as large as another employee's entire breasts; (12) attempted to follow one of the plaintiffs into the restroom and when she asked him where he was going, said that he was going to help her; (13) followed one of the plaintiffs one night; (14) said that a table in his office had been damaged when one of the plaintiffs and a male co-employee had sex on top of it; (15) openly stared at the plaintiffs' sexual anatomy; (16) put his arm around the plaintiffs, grabbed their arms, and stroked their necks; and (17) made other lewd remarks and gestures to the plaintiffs.

*Busby*, 551 So.2d at 324. While finding that this conduct was outrageous, the court refused to find the company liable for the supervisor's actions because the supervisor's conduct was not related to the furtherance of Truswal's business, and the plaintiff failed to give sufficient notice to the company as to the severity of the conduct or give it time to correct the situation. *Id.* at 328. The court further stated that the tort of outrage should not be the basis for vicarious or *respondeat superior* liability except in the most compelling circumstances. *Id.* at 327.

The actions of Taylor simply do not rise to such a level that they could be considered "so severe that no reasonable person could be expected to endure it." *Inmon*, 394 So.2d at 365. However, assuming that these actions amount to outrageous conduct, defendant took adequate action to remedy the situation when it

counseled Taylor, keeping in mind that although Humphries testified that Taylor's conduct affected her emotionally, she testified that Taylor's conduct never prevented her from performing her job.  Furthermore, although Taylor's sex-related comments were continuous, he never touched plaintiff or threatened to touch her in any manner. The allegations do not, as a matter of law, present an extreme case of outrage sufficient to hold Guardsmark liable under a theory of *respondeat superior*.

**Invasion of Privacy Claim**

Plaintiff has asserted a claim against Guardsmark for invasion of privacy.  In a suit for invasion of privacy, the plaintiff must show one of four acts occurred: (1) an intrusion into the plaintiff's physical solitude or seclusion; (2) publicity which violates the ordinary decencies; (3) putting the plaintiff in a false, but not necessarily defamatory, position in the public eye; or (4) the appropriation of some element of the plaintiff's personality for a commercial use.  *Phillips v. Smalley Maint. Servs., Inc.*, 435 So.2d 705, 708 (Ala. 1983).  This case falls into the intrusion upon physical solitude or seclusion category.  This category is further defined as "the wrongful intrusion into one's private activities in such manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities."  *Logan v. Sears, Roebuck & Co.*, 466 So.2d 121, 124 (Ala. 1985).

47

Although plaintiff claims that she has suffered some mental anguish as a result of Taylor's actions, her testimony does not reflect that her distress was extreme. (*See* Humphries Depo. at 375-81].   However, even assuming the conduct was sufficient to amount to invasion of privacy, Guardsmark took action as soon as it learned of Humphries' complaint and, despite the shoddy investigation of her claims by Pettis, counseled Taylor about this kind of conduct and warned against making sex-related comments or conversation with anyone in the guardhouse.   As noted above, this action was sufficient to stop the harassing conduct, but for one instance.   Therefore, there is no basis for holding Guardsmark liable under a theory of *respondeat superior*.

## Negligent Supervision, Retention and Training

In *Big B, Inc. v. Cottingham*, 634 So.2d 999, 1003 (Ala. 1993), citing *Thompson v. Havard,* 285 Ala. 718, 723, 235 So.2d 853 (1970), the Alabama Supreme Court stated that in the master and servant relationship, the master is held responsible for the servant's incompetency when notice or knowledge, either actual or presumed, of the incompetency has been brought to the attention of the master. For the master to be held liable for the servant's incompetency, it must be affirmatively shown that had the master exercised due and proper diligence, the master would have learned of the incompetency.   This may be done by showing

specific acts of incompetency and showing that they were brought to the knowledge of the master, or by showing them to be of such a nature, character, and frequency that the master, in the exercise of due care, must have had notice of them.  However, a verdict against a defendant based on a finding of a negligent or wanton failure to investigate a complaint of sexual harassment, in a setting where the plaintiff has failed to prove sexual harassment, cannot stand.  *Stevenson v. Precision Standard, Inc.*, 762 So.2d 820, 825 (11th Cir. 2000).

As noted above, plaintiff has failed to establish a *prima facie* case of harassment on the part of Guardsmark.  Furthermore, plaintiff has not shown that Guardsmark knew or should have known of Taylor's conduct before Ms. Humphries made her June 2002 complaint.  Her statement to Keith Rosamond in the Spring of 2002 that Taylor was "harassing" her and other guards and his reply that this was "no surprise" is insufficient to show Guardsmark knew or should have known of Taylor's sexual harassment of Ms. Humphries.  Rosamond was not the correct individual to complain to, and Ms. Humphries did not tell him at that time that the alleged harassment was sexual in nature.  Thereafter, as discussed *supra*, Guardsmark undertook effective remedial measures which caused the conduct to cease, except for one isolated incident which went unreported by plaintiff.  Therefore, Guardsmark cannot be liable for negligent supervision, training or retention of Taylor.

## CONCLUSION

Based on the foregoing, defendant's motion for summary judgment as to plaintiff's claims of sexual harassment, assault and battery, invasion of privacy, outrage and negligent retention are due to be granted.  Defendant's motion for summary judgment as to plaintiff's claim of retaliation is due to be denied.  A separate order in conformity with this Memorandum Opinion will be entered contemporaneously herewith.

DONE this 9th day of May, 2006.

HARWELL G. DAVIS, III
UNITED STATES MAGISTRATE JUDGE